# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
Assigned on Briefs June 29, 2010

## STATE OF TENNESSEE v. JIMMY CURTIS ADKINS

**Appeal from the Hamilton County Criminal Court**
**No. 268719     Don W. Poole, Judge**

**No. E2009-02413-CCA-R3-CD - Filed December 16, 2010**

The Defendant, Jimmy Curtis Adkins, was found guilty by a Hamilton County Criminal Court jury of promoting the manufacture of methamphetamine, a class D felony, and initiating the manufacture of methamphetamine, a Class B felony. See T.C.A. §§ 39-17-433, -435 (2010). He was sentenced as a Range II, multiple offender to six years' and fourteen years' confinement, respectively, to be served concurrently but consecutively to the Defendant's convictions in Georgia. On appeal, he contends that (1) the evidence was insufficient to support his convictions, (2) the trial court erred in denying his motion to suppress evidence, and (3) the trial court erred during sentencing by considering prior convictions that were not proven by certified copies of the convictions and by considering enhancement factors that were not submitted to the jury. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and D. KELLY THOMAS, JR., JJ., joined.

Ardena J. Garth, District Public Defender; and Richard Kenneth Mabee, Assistant District Public Defender, for the appellant, Jimmy Curtis Adkins.

Robert E. Cooper, Jr., Attorney General and Reporter; Matthew Bryant Haskell, Assistant Attorney General and Reporter; Bill Cox, District Attorney General; and James Woods, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This case relates to the arrest of the Defendant by United States Marshals, a search of the home where the Defendant was found and of a van parked outside of the home, and the

discovery of materials used to manufacture methamphetamine. Chattanooga Police Department Officer Charles Topping testified that he assisted in the arrest of the Defendant on February 22, 2007. He said officers on the scene noticed a van with dark tinted windows parked in front of the home where the Defendant was arrested and called Hamilton County narcotics officers to inspect the van. He said that the officers did not tamper with the contents of the van before it was searched, although he acknowledged that he left the scene before officers searched the van.

On cross-examination, Officer Topping testified that when he arrived on the scene, the Defendant was in the house. He agreed a woman was also in the house but said he did not know who owned the home.

Hamilton County Sheriff's Officer Andy Brown testified that he was a member of the narcotics and special operations division. He said he responded to 1807 Bay Hill Drive to investigate a van that was believed to contain a methamphetamine lab. He said the van was parked in the street in front of a home where the Defendant was arrested. He said that a strong chemical odor came from the van and that the smell was so strong that he could only be near the van for short periods of time. He said he had investigated methamphetamine labs in the past. He said the scent coming from the van was consistent with the unique odor of a methamphetamine lab. Inside the van, the police found several items that were consistent with the components of a methamphetamine lab, some of which were contained in black bags. He said he, Detective Robin Langford, and Officer Henry Ritter processed and inventoried the items taken from the van.

On cross-examination, Officer Brown testified that he inventoried the contents of the van and the home where the Defendant was found. He said that the Defendant was inside the home when he arrived and that a woman who lived there was also present. He said that the woman's car was in the driveway but that he did not recall asking her who owned the van. He said that the bags in the van could be seen from the driver's seat but that the bags were closed when they began searching the van. He said officers found two glass pipes on the floorboard. He said the pipes may have been visible from the driver's seat. He said that men's clothing was found in the van but that he did not inventory the clothes or know their size. He said other officers on the scene photographed the items removed from the van. He identified a photograph of a coffee grinder containing white residue that was removed from the van. Officer Brown said the scent coming from the van was consistent with the odor of a methamphetamine lab. He admitted that he would not have been able to identify the smell if he had not been trained to recognize the scents associated with methamphetamine labs.

Hamilton County Sheriff's Officer Robin Langford testified that he was a member of the narcotics and special operations division. He said he responded to 1807 Bay Hill Drive

to investigate a van that was believed to contain a methamphetamine lab. Upon arriving, he had a police dog walk around the van. He said that after the dog signaled that the van contained the scent of narcotics, the van's interior was searched. He noticed the smell of methamphetamine production and found components of a methamphetamine lab in the van. He said black bags contained a coffee grinder, yellow stained coffee filters, a Mason jar containing a liquid that appeared to have been used to wash pills, a Mason jar containing a two-layer liquid, a pill bottle taped around the cap that contained a red residue consistent with iodine crystals, plastic hoses wrapped with electrical tape, glass tubing, and glass beakers. He said the bags also contained a coffee pot, electric burners, and a can of methanol gel. He said that coffee pots were often found in methamphetamine labs and that they were used to cook methamphetamine. He said methanol gel was often used as a source of heat in mobile methamphetamine labs. He also found a propane canister, a propane torch, and a bottle of Liquid Fire drain opener in the bags. He said a chemical in the drain opener was used to manufacture methamphetamine and was often found in methamphetamine labs. He found a shoebox inside the van that contained electrical cords, plastic tubing, and a canister of Oxy Clean with a hidden safe in the bottom. He said he unscrewed the base of the canister and found plastic bags containing white powder and two stained and burned glass pipes.

Officer Langford testified that he found a Valvoline receipt from a service station in Georgia near the driver's seat. The receipt reflected that the van's oil was changed and other routine maintenance was performed two days before the Defendant was arrested and the van searched. The receipt contained the vehicle's make, model, and license plate number, as well as the Defendant's name and the address of his home in Georgia. Officer Langford also found a cellular telephone invoice listing the Defendant's name and address and reflecting that the Defendant placed an order and paid his telephone bill five days earlier.

Officer Langford testified that he had processed between thirty and thirty-five methamphetamine labs with the narcotics division. He said that fingerprints were not taken at any of those labs and that police did not take fingerprints from the van. Inside the kitchen of the home where the Defendant was found, he found a Gatorade bottle and a Mason jar, each containing a blue two-layer liquid. He also found a Pyrex dish containing a blue powder residue and a can of acetone.

On cross-examination, Officer Langford testified that other officers were at the home when he arrived and that his purpose in responding to the scene was to investigate the home and the van, which were suspected to contain materials used to manufacture methamphetamine. He said he found additional items in the kitchen, including a Gatorade bottle containing a red two-layer liquid, a cookie jar containing stained coffee filters, and stained plastic funnels. He did not know if any of the items were moved before he arrived. He admitted that he did not test the powder residue in the Pyrex dish but said that the residue

was consistent with residue commonly found on tools used in methamphetamine labs. He also admitted that he did not test the two-layer liquids but said he had seen red and blue two-layer liquids only in methamphetamine labs. He said he found a glass pipe underneath a woman's pocketbook, a digital scale, and marijuana in the living room.

Officer Langford testified that the evidence log of items removed from the van listed the Defendant as the arrestee, while the evidence log of items removed from the home listed Cynthia Denise Strickland as the arrestee. He said Ms. Strickland owned the home where the Defendant was arrested. He said that he did not take fingerprints from any of the items removed from the home or van and that a hazardous materials team collected the items and destroyed them after the items were photographed. He said it was standard procedure to destroy items used to produce methamphetamine because they contained dangerous, volatile chemicals.

Officer Langford testified that the van was parked on a public street in front of Ms. Strickland's home. He said that although the van had an Alabama license plate and was registered to Freddie Ramsey, a resident of Alabama, it was his understanding that the Defendant had been driving the van. He admitted that his investigative report did not note that he was told about an odor coming from the van before searching it. He said he found a bottle of Heet gasoline antifreeze and a Sterno burner in a rear compartment of the van. He agreed that he found the shoebox containing electrical cords, plastic tubing, and a hidden safe in a white plastic bag in the rear of the van. He agreed that he misspoke when he said that a pill bottle removed from the van contained iodine crystals around the rim and admitted that the gray substance around the rim of the bottle was actually foil. He agreed he considered the items found in the black bags to be components of a methamphetamine lab. He said the other items found in the van were also consistent with methamphetamine lab components.

On redirect examination, Officer Langford testified that the Defendant was not charged with possessing items found in the home. He said that although the pill bottle removed from the van did not appear to contain iodine crystals around the rim, it appeared to contain iodine crystals inside the bottle. He said he examined all of the recovered items as a whole, rather than individually, to determine whether a methamphetamine lab existed. He agreed that otherwise innocuous items could be combined to create a methamphetamine lab.

Hamilton County Sheriff's Officer Henry Ritter testified that he was a member of the narcotics and special operations division and that he served as a K-9 handler. He said that his dog was trained and certified in narcotics detection and that he was certified to handle the dog. He said he went to 1807 Bay Hill Drive to investigate a van believed to contain a

methamphetamine lab. He had his police dog walk around the van. He said the dog signaled that it detected the scent of narcotics. He began to search the van and noticed a very strong odor that was consistent with the odor in methamphetamine labs. He said the scent was so strong that officers could only remain in the van for a few minutes at a time.

Drug Enforcement Administration Agent Frank Ledford testified as an expert witness in narcotics investigation and clandestine laboratories. He said he did not take part in the arrest of the Defendant or the search of the van. He explained how to make methamphetamine using the red phosphorous method, a method popular in eastern Tennessee. He said pseudoephedrine and iodine crystals were used to make methamphetamine. He said that coffee grinders were often used to grind pills containing pseudoephedrine into a white powder and that persons in eastern Tennessee strained cooked methamphetamine solutions through coffee filters. He said Heet gasoline antifreeze and Liquid Fire drain opener were solvents commonly used during methamphetamine production. He said solvents caused liquid methamphetamine solutions to separate into two layers.

Agent Ledford examined a photograph of the coffee grinder removed from the van and testified that the appearance of the white powder on the grinder was consistent with ground pseudoephedrine. He examined a photograph of the plastic pill bottle removed from the van and said it appeared to be stained with iodine crystals. He said the electrical tape around the lid of the bottle was a common method to prevent the evaporation of the iodine crystals. He examined a photograph of plastic tubing removed from the van and said the red stains on the tubing were consistent with the stains caused by iodine crystals during methamphetamine production. He examined a photograph of the coffee filters removed from the van and said the yellow stains on them were consistent with the stains caused when filtering methamphetamine out of a cooked solution. He said methamphetamine producers often saved these filters and mixed them with beverages to leach out any remaining methamphetamine.

Agent Ledford testified that coffee pots and glass beakers were often used to cook methamphetamine. He said that plastic tubing often connected the glass vessels and was used to condense the evaporating methamphetamine vapors. He examined a photograph of plastic tubing removed from the van and said the white residue in the tubing was consistent with the residue caused by condensed methamphetamine. He testified that the plastic tubing and glass beakers found in the van were consistent with a homemade methamphetamine condenser. He said electric burners, propane torches, and cans of methanol gel were often used as sources of heat when cooking methamphetamine. He said the van appeared to contain a methamphetamine lab.

On cross-examination, Agent Ledford testified that he learned to recognize the scents produced by methamphetamine labs by investigating them. Although he agreed that a person who had not previously encountered a lab might not recognize the smell, he said most reasonable people would know that something was "not right . . . because it's a very assaulting smell." He agreed that he could not be certain whether the items removed from the van contained methamphetamine or a methamphetamine precursor because he was not present when the van was searched.

The Defendant did not testify. The jury found the Defendant guilty of promoting the manufacture of methamphetamine and initiating the manufacture of methamphetamine. He was sentenced as a Range II, multiple offender to six years' and fourteen years' confinement, respectively, to be served concurrently to each other and consecutively to the Defendant's convictions in Georgia. This appeal followed.

# I

The Defendant contends that the evidence was insufficient to support his convictions because the evidence did not establish that the items removed from the van contained methamphetamine or a methamphetamine precursor, such as pseudoephedrine. The State contends that the evidence was sufficient to support the Defendant's convictions. We agree with the State.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This means that we may not reweigh the evidence but must presume that the trier of fact has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Any questions about the credibility of the witnesses were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A person promotes the manufacture of methamphetamine who "sells, purchases, acquires, or delivers any chemical, drug, ingredient, or apparatus that can be used to produce methamphetamine, knowing that it will be used to produce methamphetamine, or with reckless disregard of its intended use." T.C.A. § 39-17-433(a)(1). Additionally, a person may not "knowingly initiate a process intended to result in the manufacture of any amount of methamphetamine." T.C.A. § 39-17-435(a). To initiate the manufacture of methamphetamine means "to begin the extraction of an immediate methamphetamine precursor from a commercial product, to begin the active modification of a commercial

-6-

product for use in methamphetamine creation, or to heat or combine any substance or substances that can be used in methamphetamine creation." Id. at -435(c). Expert testimony of a qualified law enforcement officer is admissible to establish that a particular chemical, drug, ingredient, or apparatus can be used to produce methamphetamine. Id. at -433(b). Expert testimony of a qualified law enforcement officer is admissible for the proposition that a particular process can be used to manufacture methamphetamine. Id. at -435(d). We note from the statutes that the offenses can be proven without the presence of methamphetamine or its precursors.

Taken in the light most favorable to the State, the evidence established that officers searched a van containing the Defendant's personal effects that was parked in front of the home where the Defendant was arrested. The van contained a recent cellular telephone invoice listing the Defendant's name and his address in Trenton, Georgia. It also contained a recent Valvoline receipt from a service station in Georgia listing the van's make, model, and license plate number, as well as the Defendant's name and the address of his home in Georgia. The evidence did not reflect that anyone else entered or drove the van near the time of the search. From this, the jury could reasonably infer that the Defendant possessed the van and its contents. A trained police dog indicated that the van contained the scent of narcotics. Experienced officers noted a strong chemical odor in the van that was consistent with the production of methamphetamine. The odor was so strong that officers could only remain in the van for a few minutes at a time while searching it. Agent Ledford testified that persons driving the vehicle would know that something was "not right. . . because it's a very assaulting smell."

Inside the van, the police found numerous commercially available items that had been combined and modified to form the components of a methamphetamine lab. Officer Langford and Agent Ledford testified that the van contained many items commonly used to manufacture methamphetamine. They testified that these components gave off the scent and appearance of recent methamphetamine production and that chemicals, residue, and stains found on the items were consistent with the manufacture of methamphetamine. Agent Ledford also testified that the tubing and glass materials found in the van appeared to be a homemade methamphetamine condenser.

We conclude that a rational trier of fact could have found the elements of promoting the manufacture of methamphetamine and initiating the manufacture of methamphetamine beyond a reasonable doubt. We hold that the evidence is sufficient to support the Defendant's convictions.

## II

The Defendant contends that the trial court erred by denying his motion to suppress evidence removed from the van because the police did not obtain a search warrant before entering the van. The State contends that the trial court properly denied the motion to suppress because a search warrant was not needed after a trained police dog provided probable cause to search the van. We agree with the State.

An appellate court may consider the evidence presented at the suppression hearing as well as at trial in determining whether the trial court properly denied a pretrial motion to suppress. State v. Henning, 975 S.W.2d 290, 297-99 (Tenn. 1998). A trial court's factual findings in a motion to suppress hearing are conclusive on appeal unless the evidence preponderates against them. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996); State v. Jones, 802 S.W.2d 221, 223 (Tenn. Crim. App. 1990). Questions about the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." Odom, 928 S.W.2d at 23. The prevailing party is entitled to the strongest legitimate view of the evidence and all reasonable inferences drawn from that evidence. State v. Hicks, 55 S.W.3d 515, 521 (Tenn. 2001). The application of the law to the facts as determined by the trial court is a question of law that is reviewed de novo on appeal. State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

The Fourth Amendment to the United States Constitution protects against unreasonable searches and seizures, and "'article 1, section 7 [of the Tennessee Constitution] is identical in intent and purpose with the Fourth Amendment.'" State v. Downey, 945 S.W.2d 102, 106 (Tenn. 1997) (quoting Sneed v. State, 221 Tenn. 6, 13, 423 S.W.2d 857, 860 (1968)). The analysis of any warrantless search must begin with the proposition that such searches are per se unreasonable under the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution. This principle against warrantless searches is subject only to a few specifically established and well-delineated exceptions. See Katz v. United States, 389 U.S. 347, 357 (1967); State v. Tyler, 598 S.W.2d 798, 801 (Tenn. Crim. App. 1980). The "automobile exception" to the warrant requirement permits an officer to search an automobile if the officer has probable cause to believe that it contains contraband. Carroll v. United States, 267 U.S. 132, 149 (1925). "The rationale for the automobile exception is two-fold: (1) the impracticability of obtaining a search warrant in light of the inherent mobility of an automobile; and (2) the reduced expectation of privacy with respect to one's automobile." State v. Jose Roberto Ortiz, No. M1998-00483-CCA-R3-CD, Davidson County, slip op. at 11 (Tenn. Crim. App. Dec. 30, 1999) (citing California v. Carney, 471 U.S. 386, 393 (1985)), app. denied (Tenn. Sept. 25, 2000). If a car is readily mobile and probable cause exists to believe it contains contraband, the police may search the vehicle without exigent circumstances. Pennsylvania v. Labron,

518 U.S. 938, 940 (1996). "[T]he automobile exception does not require a separate finding of exigency under the Tennessee Constitution." State v. Saine, 297 S.W.3d 199, 207 (Tenn. 2009). If police have probable cause to search a car, they may also search containers within the car that are capable of concealing the object of the search. United States v. Ross, 456 U.S. 798, 825 (1982) ("If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search.")

The Defendant argues that the police were required to obtain a search warrant because he was arrested in the house at the time they searched the van parked on the street, thus removing the ready mobility of the van. This court previously rejected a defendant's claim that there must exist a danger that an automobile will elude the grasp of police officers in order to justify a warrantless search and stated that "we do not believe the Supreme Court intended the phrase 'readily mobile' to be synonymous with 'imminently mobile.'" Jose Roberto Ortiz, slip op. at 28 n.11. This court explained that

> While the mobility of automobiles is part of the reasoning behind [the exception], the question is not . . . whether the car is likely to be driven off; the question is whether probable cause that contraband is within the vehicle supports a search within the scope that a warrant would have authorized. It is the characteristic mobility of all automobiles, not the relative mobility of a car in a given case, that gives rise to the . . . standard [set forth in United States v. Ross, 456 U.S. 798 (1982),] which allows for warrantless searches when probable cause exists . . . .

Id., slip op. at 27 (quoting United States v. Perry, 925 F.2d 1077, 1081 n.4 (8th Cir. 1991)). Furthermore, "It is not significant for purposes of applying the 'automobile exception' to the warrant requirement that the [defendant was] already under arrest at the time of the search." State v. McCrary, 45 S.W.3d 36, 45 n.4 (Tenn. Crim. App. 2000). Thus, the ability of the police to search the van depended on whether they had probable cause to believe it contained contraband. See Carroll, 267 U.S. at 149.

The sweep of a car by a trained narcotics dog does not constitute a search under the Fourth Amendment. State v. England, 19 S.W.3d 762, 766-67 (Tenn. 2000). Although a dog's positive indication of the presence of narcotics can provide probable cause to search a car, the finding of probable cause depends on the reliability of the dog. Id. at 768. In determining the reliability of the dog, the court should consider the animal's training and track record, "with emphasis on the amount of false negatives and false positives the dog has

furnished. The trial court should also consider the officer's training and experience with [the] . . . canine." Id.

At the suppression hearing, Officer Ritter testified that his police dog received its initial training in Germany. He said that the dog received further training and certification in narcotics detection at the Rudy Drexler School for Dogs in Indiana and that the dog was trained to detect methamphetamine and methamphetamine derivatives. He stated that he spent two weeks in Indiana training with the dog and that he was certified to handle the dog. He said he continued to train with the dog at least once a week. Officer Ritter estimated that his dog had searched for narcotics between 1500 and 2000 times. He said narcotics were found ninety-five percent of the time when the dog detected a narcotic odor. In denying the Defendant's motion to suppress, the trial court found that "the dog [was] reliable and consequently, there was probable cause to believe that there were illegal drugs inside the van." This finding is supported by the record. Officer Ritter had his police dog walk around the vehicle. The dog scratched the sliding passenger door, indicating that it detected the scent of narcotics inside the van. Because the dog was reliable, its indication provided the officers with probable cause to search the van and its contents for narcotics. We hold that the trial court did not err in denying the Defendant's motion to suppress.

**III**

The Defendant contends that the trial court erred during sentencing because it considered prior convictions that were not proven by certified copies of the convictions and considered enhancement factors that were not submitted to the jury, which he argues was in violation of Blakely v. Washington, 542 U.S. 296 (2004). The State contends that the trial court properly considered prior convictions that were listed in the Defendant's presentence report and that the 2005 amendments to the Sentencing Act permitted the trial court to consider enhancement factors not submitted to the jury. We agree with the State.

At the sentencing hearing, Kim Davenport testified that she was a presentence investigator with the Tennessee Board of Probation and Parole and that she prepared the Defendant's presentence report. She said the Defendant was convicted of possessing drug paraphernalia in 1996. She said that in November 2001, the Defendant was convicted of manufacturing methamphetamine, possessing methamphetamine, and driving without a valid license in Georgia and was ordered to serve twelve years in confinement followed by three years of probation. The presentence report reflected that after filing a motion for a new trial, the Defendant was released on bond in December 2002. The presentence report also reflected that the Defendant acquired additional methamphetamine charges while released on bond. Ms. Davenport said that in October 2003, the Defendant was convicted of manufacturing methamphetamine and two counts of reckless conduct in Georgia and was

ordered to serve twenty years in confinement followed by ten years of probation. She said that the Defendant was released on parole on March 28, 2005, and that he was on parole at the time of his arrest. She said the Defendant had a pending parole violation, as well as a pending charge of possessing contraband in the Hamilton County penal facility. She said the Defendant also had outstanding warrants in Dekalb County, Alabama for possession of a controlled substance, possession of drug paraphernalia, and manufacture of a controlled substance.

On cross-examination, Ms. Davenport admitted that she did not have a certified copy of the judgment for the Defendant's 1996 conviction for possessing drug paraphernalia. She said she instead obtained a certified copy of computer records reflecting this conviction. The presentence report reflected that she had certified copies establishing the Defendant's remaining convictions for manufacturing methamphetamine, possessing methamphetamine, driving without a valid license, and reckless conduct. She agreed the Defendant had a good employment history and worked as a welder. She agreed the Defendant informed her that he was addicted to methamphetamine and had been using it for about fifteen years. She agreed she did not list any mitigating factors in her presentence report.

The trial court found that the following enhancement factors applied pursuant to Tennessee Code Annotated section 40-35-114:

> (1) the Defendant had a previous history of criminal convictions or criminal behavior;

> (8) the Defendant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community;

> (13) the Defendant was released on parole at the time the felony was committed.

See T.C.A. § 40-35-114 (Supp. 2007) (amended 2008). The trial court found that the following mitigating factors applied pursuant to Tennessee Code Annotated section 40-35-113:

> (1) the Defendant's conduct neither caused nor threatened serious bodily injury;

> (13) the Defendant had a good employment history.

-11-

See T.C.A. § 40-35-113 (2010). The Defendant was sentenced as a Range II, multiple offender to confinement for six years and fourteen years, respectively, to be served concurrently to each other and consecutively to the Defendant's convictions in Georgia.

The Defendant claims that the trial court improperly considered criminal convictions that were not proven by certified copies of the convictions. At a sentencing hearing, the trial court must afford the parties the opportunity to be heard and present evidence relevant to the sentencing of the defendant. T.C.A. § 40-35-209(b). The State has the burden of proving all enhancement factors by a preponderance of the evidence. State v. Gutierrez, 5 S.W.3d 641, 644 (Tenn. 1999). Reliable hearsay may be admitted at sentencing if the opposing party is accorded a fair opportunity to rebut such evidence. T.C.A. § 40-35-209(b). This court has consistently held the presentence report to be reliable hearsay. See, e.g., State v. Baker, 956 S.W.2d 8, 17 (Tenn. Crim. App. 1997) (holding that the information contained in a presentence report "is reliable because it is based upon the presentence officer's research of the records, contact with relevant agencies, and the gathering of information which is required to be included in a presentence report."). Likewise, the person who prepared the presentence report may be a witness at the sentencing hearing. T.C.A. § 40-35-209(b). This court has held that certified copies of convictions are not necessary to prove prior criminal history and that courts can rely upon the presentence report and the testimony of the person who prepared the report. See State v. Richardson, 875 S.W.2d 671, 677 (Tenn. Crim. App. 1993).

We note that the Defendant incorrectly asserts that Ms. Davenport did not have certified copies of his 2001 convictions for possessing methamphetamine and driving without a valid license or his 2003 convictions for reckless conduct. The presentence report contains certified copies of these convictions. The only conviction listed in the presentence report that was not established by a certified copy of conviction was the Defendant's 1996 conviction for possessing drug paraphernalia. Ms. Davenport testified that she obtained a certified copy of computer records reflecting the 1996 conviction. The Defendant was accorded a fair opportunity to rebut the evidence of this conviction and failed to do so. The Defendant did not contend that the presentence report or the testimony of Ms. Davenport was incorrect. As a result, the presentence report and testimony of Ms. Davenport were properly admitted by the trial court as reliable hearsay. See T.C.A. § 40-35-209(b). A certified copy of the Defendant's 1996 drug paraphernalia conviction was not required to establish it by a preponderance of the evidence, and the court properly relied on the presentence report and the testimony of Ms. Davenport. See Richardson, 875 S.W.2d at 677. The Defendant is not entitled to relief on this issue.

We next consider the Defendant's claim that the trial court violated Blakely v. Washington by considering enhancement factors that were not submitted to the jury. 542

U.S. 296 (2004). The Defendant's reliance on Blakely is misplaced. In Blakely, the Supreme Court held, "If the jury's verdict alone does not authorize the sentence, if, instead, the judge must find an additional fact to impose the longer term, the Sixth Amendment requirement is not satisfied." Cunningham v. California, 549 U.S. 270, 290 (2007) (citing Blakely, 542 U.S. at 305). In order to avoid the constitutional violation arising from a trial court increasing a presumptive sentence on the basis of judicially determined enhancement factors that were not submitted to the jury, the Tennessee Legislature amended the Sentencing Act in 2005. The Sentencing Act no longer imposes a presumptive sentence and instead states that the court shall consider, but is not bound by, the following advisory sentencing guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

T.C.A. § 40-35-210. From this, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Carter, 254 S.W.3d at 343 (quoting T.C.A. § 40-35-210(d)). We hold that the trial court did not err by considering enhancement factors that were not submitted to the jury.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE